LOUIS H. YARRUT, Judge ad hoc.
This is an appeal from a judgment allowing defendant-owner $15,700 for his home expropriated by plaintiff. Defendant’s original claim was $18,000, now reduced to'$17,-300 as defendant’s own experts fixed the value at that amount, which defendant concedes. Hence, the amount in dispute is only $1,600.
This suit was instituted by the State of Louisiana, through the Department of Highways, for the expropriation, for highway purposes, of a lot of ground situated in the Parish of Jefferson and owned by the defendant, in accordance with the authority conferred by Section 19.1, Article VI, Constitution of Louisiana, LSA and the provisions of LSA-R.S. 48:441-460. The property is described as Lot “L” of Square No. 150, Harlem Subdivision, together with the buildings and improvements thereon, designated as 3101 Carrollton Way, measuring 50 feet on Carrollton Way by a depth between parallel lines of 120 feet, located in close proximity to parochial and public schools and churches, about five blocks from retail stores and supermarkets, with convenient public transportation one block away, on Jefferson Highway.
The dwelling is described as a frame, single house with two bedrooms, living room, dinette, and kitchen, with exterior walls of asbestos-siding over storm sheathing. The *782 original garage was converted into a rumpus room to conform with the general construction of the dwelling proper. The interior walls were finished with sheetrock and knotty pine paneling in some of the rooms, with double flooring, hardwood finish, with two-ton central airconditioning unit; attic insulted with fiberglass, and the yard enclosed with a wire fence, 181 feet. Utilities consisted of natural gas, electricity, water and sewerage.
Plaintiff’s right to expropriate is conceded. The only issue is the fair market value of the property at the time of expropriation in 1956.
The dwelling in question was built sometime in 1950 by the father of defendant, a contractor and builder of 10 years’ experience. He built houses ranging from $10,500 to $32,000, the average costing from $17,000 to $18,000. The father testified this property was well worth $17,300, and, while generally regarded of modest construction, the best material and workmanship was used, since he was building it as a permanent home for his son and family. All experts practically agree on the land value and improvements but disagree on depreciation.
Mr. Vincent J. Trapani, for the defendant, fixed the lot’s value at $6,000 or $120 per front foot, and the improvements at $11,300, or a total of $17,300, subject to no depreciation. The experts for plaintiff valued the whole at $15,700, the lot at $6,250, and the improvements at $9,450. Breaking this down, the main house has 1,060 square feet and a rumpus room of 320 square feet. They figure the cost of the main house at $10 per square foot, and the rumpus room at $7 per square foot, plus awnings and fence valued at $440, making a total of $13,280 for the improvements. However, they deduct $3,852 for depreciation or 30%, and give a net value to the improvements of $9,428. The over-all value of both lot and improvements, less depreciation, they fix at $15,700.
Plaintiff’s experts arrived at their valuation by two methods: (1) comparable sales in the neighborhood; and (2) cost of replacement of the improvements, plus the value of the ground.
We disregard the comparable sales, because the properties cited as comparable were located at quite some distance from the property in question, had one or more rooms and of different construction, all of which was offset by the proximity of the dwelling at issue to schools, churches, transportation and shopping centers. Furthermore, since the neighborhood is vastly improving and this home was built specially for the defendant, we believe the testimony here must necessarily be the cost of replacement at the time of the taking, less depreciation, if any.
Plaintiff’s experts admit the house is well built, of good materials, substantial, and in first-class condition.
There is not even a whisper that the neighborhood is decadent or that the house is in the least state of disrepair. However, they both testified, strangely enough, that the moment the house was completed in 1950, it suffered 30% depreciation.
Max Derbes, Jr., gave his analysis as follows :
“Q. Over a period of five years, the depreciation would be thirty percent? A. Yes, it depreciated thirty percent the day it was built in my opinion. That meant it lost value to the tune of thirty percent of the replacement cost of the improvements. The reason for it being that, the value of the land is higher because of the commercial influence of Jefferson Highway right behind it. This same property could have been put on a lot worth $3,000 and the unit value of the both could have been $16,000 or so. Incidentally, of the thirty percent I am incorrect in stating it would depreciate thirty percent the day it was built. But it did have some wear and tear on it after six years, so a portion of $3800 depreciation is caused by wear *783 and tear but the majority is caused by the very high land value.
“Q. In other words, there is a possibility this land could have been used for commercial purposes? A. Yes.
“Q. And the sale of that land for commercial purposes would have brought how much? A. $6,250. It could have brought $6,250 for residential purposes in my opinion.”
Charles J. Derbes gave his analysis as follows:
“Q. What justification do you have to depreciate the subject property by some 30 percent? A. I think I qualified my interpretation of depreciation, that this depreciation was not entirely deterioration. There is also functional deterioration, there in that the market today calls for three and four bedroom houses rather than for two, so, there is some penalty for the fact you only have two bedrooms.
“The neighborhood or economic depreciation is something that doesn’t necessarily come about by time. If you build a $50,000 brick home in a predominantly double-house neighborhood, the day you finish it the economic depreciation would take effect. I have merely summed up in my own mind in reaching an estimate of value what is the depreciation, and taking this to consider all the aspects of depreciation, not only physical depreciation but economic depreciation.
“Q. What would be the economic depreciation of the subject property other than it had two bedrooms instead of three ? A. I don’t think I made myself clear to you. Depreciation is broken down into several factors. An economic depreciation is without the building itself. That comes by the valuation in the eye of the appraiser or the buying public of what the neighborhood thinks. The functional depreciation is that which encompasses or comes within the building itself. I would say that was functional depreciation, economical depreciation and physical deterioration. I think we will agree the physical deterioration was not too much of the 30 percent I may have put in ten percent. The other twenty or twenty-five percent is your estimate of economic depreciation and the functional depreciation.
“Q. In other words, when you say it has depreciated 30 per cent in five or six years, do you mean this property only has another fifteen years? A. I didn’t say it would depreciate 30 percent by functional obsolescence the day he built it — ten years — ten percent depending on what was the market demand.
“Q. What would you estimate the remainder of life in that structure was when you examined it? A. That building was substantially built and could be said to last another thirty or forty years. * * * ”
That the 50 x 120 foot site here could be used for commercial purposes is of no moment, since the value of $125 per front foot is not excessive in a fast-growing, up-to-date residential subdivision. Defendant is not claiming the commercial, only the residential value of the site.
Nor is there any concrete or factual evidence that residences with only two bedrooms and one bath in this subdivision are in less demand than those with three bedrooms and two baths. The demand is usually controlled by size of family and finances. The testimony on this score seems more academic than factual.
Under the circumstances it seems clear that a fair market value at the time of the taking was well established at $17,300. See Plaquemines Parish School Board v. La Grange Realty, Inc., La.App., 101 So.2d 634.
*784 Accordingly the judgment of the District Court will be amended so as to increase the award from $15,700 to $17,300, plaintiff and appellee to pay all costs in both courts.
Amended and affirmed.
REGAN, J., absent.